James A. BEDE and Bede Products Cor-
poration, Plaintiffs-Appellants,

v.

BAKER & ENGLISH, INC., Spee-Flo
Company, Inc., Defendants-
Appellees.

No. 13843.

United States Court of Appeals
Sixth Circuit.

Feb. 11, 1960.

William E. Williams, Cleveland, Ohio
(of Hudson, Boughton, Williams, David
& Hoffmann, Cleveland, Ohio, on the
brief), for appellants.

H. F. McNenny, Cleveland, Ohio (of
Richey, McNenny & Farrington, Cleve-
land, Ohio; Clifford E. Bruce, Cleveland,
Ohio, on the brief), for appellees.

Before McALLISTER, Chief Judge,
and MILLER and CECIL, Circuit Judg-
es.

McALLISTER, Chief Judge.

Appellant, James A. Bede, the owner
of the patent in suit [1] relating to a paint
heater, of particular utility in the hot
spraying of paint, filed his complaint
against appellee, Baker & English, Inc.,
claiming that it infringed his patent.
Bede Products Corporation, the other
appellant, is Bede's exclusive licensee.
The other appellee, Spee-Flo Company,
Inc., is the manufacturer of the accused
paint heater, and filed an answer as an
intervenor. Appellees' defense to Bede's

---

1. No. 2,576,558.

complaint was that his patent was invalid for want of invention, and furthermore, that there was no infringement. The District Court determined that the patent was valid, but held that it had not been infringed. From this decision, Bede, and the Bede Products Corporation appeal. On appeal, it is contended by appellees that not only have they not infringed the patent, but also that it is invalid for want of invention.

The circumstances constituting the background of the case disclose that both hot and cold spraying of paint was known prior to the issuance of the patent in suit. It appears that, in cold spraying, the paint, being highly viscous, cannot readily be sprayed. Accordingly, it is required to be thinned by the addition thereto of solvent thinners. The addition of these thinners reduces the ratio of solid pigment in the paint, so that a cold sprayed paint results in such a thin film that it is necessary to apply a number of coats to a surface in order properly to cover it, and produce a paint film of the requisite thickness.

It has long been recognized that if paint is heated, it is more readily flowable and can be more effectively sprayed. Heated paint does not require the addition of large amounts of thinner solvents, and, accordingly, does not call for the application of a number of coats of paint to a given surface. Hot spraying produces smoother surfaces than can be produced by cold spraying.

However, the methods which were first used to heat the paint by steam coils and the like, proved inefficient; and the more efficient method of direct transfer of heat from electric heating elements to the paint proved dangerous because of explosive vapors. It was found, however, that the paint could be safely heated by an electric element if such element were protected or enclosed in an explosion-proof cover. Such explosion-proof cover was required to be strong enough to withstand internal explosions within the cover, caused by the seeping in of explosive vapors, and their coming in contact with a spark of the electric heating element, and to be of such construction that flames from such an internal explosion would be prevented from leaking out and igniting explosive vapors outside the cover.

One form of explosion-proof cover used in the art prior to the patent in suit consists of a threaded cap, machined to certain dimensions, so that when it is screwed into place, it leaves a leakage passageway through the threads, of a certain critical length and width—the critical relation of length to width depending upon the particular gas or explosive vapor encountered. The leakage passageway through the threads, as above described, provides a minute escape passage, so that any possible flame formed at the electric heating element will not be able to get through the passageway formed by the threads, and ignite the explosive vapors beyond, but will be extinguished before it gets outside the cap.

Appellant Bede had, prior to the patent in suit, been granted a patent on a paint-spraying apparatus, No. 2,481,813, providing for a heating transfer element consisting, among alternative heat-conducting media, of a solid aluminum block which was heated by an electric heating unit. Surrounding the heating transfer element was a coil through which passed, under pressure, the paint to be heated. No explosion-proof cover protected the electric heating unit in this earlier patent; and the underwriters refused to approve the apparatus, when Bede submitted it to them.

In the patent in suit, Bede followed to some extent, at least, his earlier patent which, insofar as this case is concerned, partakes of the prior art. He chose a cylindrical heat transfer block of aluminum. Instead of a coil around the aluminum block as in the prior patent, the aluminum block was cast around an helically coiled tube, with inlet and outlet conduits controlled by valves. The aluminum block was heated by an electric heating element. This heating element was at the top of the heat transfer block of aluminum instead of at the bot-

tom, as in the earlier patent. Moreover, the electric heating element was protected by an explosion-proof cover. The explosion-proof cover was of a conventional type, and was purchased by Bede, in the open market, from the seller and manufacturer, the Crouse-Hinds Company. The explosion-proof cover was screwed onto the top of the aluminum block over the electric heating element, which, in effect, was thus located within an explosion-proof "chamber." The whole was surrounded by a jacket of heat insulating material, located within a shell, as housing, as was the apparatus and insulation of the prior patent.

In his opinion, the trial judge stated that during the trial he entertained some doubt as to the inventive character of the patent in suit, but that he had finally concluded that it had inventive status "because of the novel, unique arrangement and disposition of the essential elements and incorporation of the 'built-in' explosion-proof chamber and leakage passageway within the heat exchange block, so as to produce a compact, convenient, economical and commercially successful paint heater not theretofore disclosed in the prior art." The opinion went on to say that appellant Bede had combined known elements in such a new and useful way as to add something of value to the art of hot paint spraying. The trial court continued: "The prior art perhaps discloses the individual elements which were adopted by Bede but no one before Bede disclosed a completed combination so ordered and organized as to meet the type of heater that the paint spraying industry had been looking for, as evidenced by the response when Bede appeared with his heater * * * something more than mechanical or electrical engineering skill would have been required to combine the essential elements of the plaintiffs' paint heater into such a compact, convenient unit of the character described and patented by Bede. At least it had not been obvious before Bede's disclosure."

In holding that Bede's patent was valid, the trial judge in his opinion,

nevertheless, concluded that all of the combined elements of the patent in suit were in the public domain, and had been disclosed by the earlier art and publications.

██ We proceed, then, to consider the question of validity of the patent. Although the District Court held that the patent was not infringed by appellees, it did determine that the patent was valid; and while appellees did not file a cross appeal from the holding of validity, nevertheless that issue is properly before us for decision. Not only was it conceded on the argument of the case that, in order to raise the question of validity, it was not necessary for appellees to file a cross appeal from the District Court's holding of validity, but, according to the authorities, appellees are entitled to an affirmance of the judgment if, for any reason, it is right, even though appellees rely upon invalidity, and did not file a cross appeal from the District Court's finding that the patent was valid; and where an appeal is taken from a judgment dismissing a patent infringement action on the ground that the patent involved was not infringed, it brings up the whole case, and appellees are entitled to an affirmance on the ground that the patent is invalid, although the judgment of the District Court was based only upon a determination of non-infringement. Merco Nordstrom Valve Co. v. W. M. Acker Organization, Inc., 6 Cir., 131 F.2d 277; Pennington Engineering Co. v. Spicer Mfg. Corp., 6 Cir., 165 F.2d 59; Stelos Co. v. Hosiery Motor-Mend Corp., 295 U.S. 237, 55 S.Ct. 746, 79 L.Ed. 1414; Langnes v. Green, 282 U.S. 531, 51 S.Ct. 243, 75 L.Ed. 520. See also Powder Power Tool Corp. v. Powder Actuated Tool Company, Inc., 7 Cir., 230 F.2d 409.

The uncontroverted evidence shows that an explosion-proof chamber like the one in the patent in suit is old; that it serves the same function generally and is constructed in the same way as explosion chambers had always previously been constructed; that the heat transfer element, or cylindrical aluminum block,

had been used before the patent in suit for the same purpose and in the same way as in Bede's patent in suit; that such a metal block had been heated by an electric heating unit in the same way in the prior art as was patentee's apparatus; and that there was no joint action between Bede's explosion-proof chamber formed by the explosion-proof cover and the heat transfer block that produced any different results than the individual results of those elements. In other words, the explosion-proof chamber functioned in the same way whether it was within the metal block or in a separate box, outside the block; and the function of the electric heating unit remained unaffected and unchanged by the presence or absence of the explosion-proof chamber. As far as heating the paint, the operation would be the same whether or not there was an explosion-proof cover or chamber in the apparatus. Explosion-proof chambers, in the prior art, were to be found in separate boxes attached by a conduit to the heating element, which was the element from which a spark might ignite explosive vapors. Appellants rely upon the claim that the individual elements which were adopted by Bede disclosed a completed combination so ordered and organized as to meet the type of heater the paint-spraying industry had been looking for. In sum, it is contended by appellants that invention in the patent in suit resides in the integration of the explosion-proof chamber within the heat exchange block itself—or, in other words, that the metal block which serves as the heat exchange medium has an integral part which is used as a portion of the explosion-proof box, or chamber. It may be assumed that appellants' apparatus embodied a more convenient, compact, economical, and commercially-successful paint heater than had theretofore been made and offered to the public. But all the elements of Bede's patent in suit were old, and all functioned in the same way as they had always functioned in other constructions.

When Bede had secured his prior patent, No. 2,481,813 (which is prior art in this case), he had an apparatus very similar to the patent in suit except that the heating element extended into the bottom of the block instead of into the top, and had no explosion-proof cover or chamber. At that time, the Hercules Powder Company was greatly interested in promoting the hot-spraying process in order to expand its market for nitro-cellulose and resins, used in paint. When the Hercules Company came upon appellant's patent—now a part of the prior art—it suggested to him that he secure the underwriters' approval on his heater. One of the requirements for such approval is that all electrical equipment be protected by explosion-proof covers. Bede bought an explosion-proof cover for his apparatus which he now had cast in such a way that there was a recess in it. He then caused threads to be made at the end of the apparatus, similar to his old patent. The explosion-proof cover was then screwed onto the threaded end of the apparatus. In the recess or "chamber," formed by the recess and cover, was located the electric heating element. The explosion-proof feature was provided by the threads of the cover and the recess—"the minute leakage passageway"—which, as heretofore stated, prevented any flame, caused by a spark at the electric heater igniting the vapor, from escaping to the outside, by extinguishing it, before it had reached the exterior of the cover. Having in hand an apparatus almost identical to the prior art with the exception of an explosion-proof cover, and having been requested by the Hercules Company to secure the underwriters' approval which required such a cover over an electric heater, it would hardly seem an inventive step to modify the end of the block where the heater was located in such a way as to attach the cover over the heater.

While it is emphatically stated by appellants that there is no evidence to support the contention that Bede obtained the construction of the patent in suit by

merely screwing a Crouse-Hinds explosion-proof lid onto the heater of said Bede patent No. 2,481,813, nevertheless this appears clearly to be the case. Appellants' expert witness testified that "we use the same element, the same block, heat transfer block as a portion of that box." It is true that the witness felt that there was a patentable combination resulting from the construction of the explosion-proof chamber in the end of the heating element. He testified that "the crux of the invention or the heart of the disclosure which Bede made centers around the heat transfer block which is made of aluminum * * *. This one block, this one element * * * serves to provide a very uniform heating. It does that by virtue of its property of very high thermal conductivity. It serves as an efficient heater because inasmuch as its high thermal conductivity we get heat transfer across the walls of the paint coil on all sides. This same block, this same heat transfer block serves as a portion—it is used as a portion of the explosion-proof chamber. We don't have to buy or purchase or construct a separate explosion-proof chamber. I mean not completely. We do have to construct the * * * cap * *, but the same heat transfer block, the same casting serves as a portion of our explosion-proof chamber. This same heat transfer block serves—you can within there make provision for our thermostat so that it serves as the temperature sensing means of our paint. We don't have to put a thermometer in the paint, the coil itself. It is due to the multiplicity of functions which this [heat transfer block] serves, that we are enabled thereby to get a very lightweight, a compact, a very efficient unit and that really is the heart of the invention that we have here, one element. And I think we can focus our attention on that aluminum transfer block * * * serving a multiplicity of functions as being the heart of the—the crux of the disclosure of the Bede patent." [2]

2. With regard to the "minute escape passage-way" formed by the threads of the explosion-proof top, the trial judge was interested in ascertaining the bearing this arrangement had upon the claim of infringement and the validity of the invention, and questioned the witness as follows:

"The Court: The threaded arrangement was well known?

"The Witness: And that it constituted a minute passage. It was known. The code handbook says so that that is the same result. So that was known.

"The Court: Well, then, if that was known, how do you account for your testimony that the defendants' screw top was an infringement of the plaintiffs' patent?

"The Witness: Your Honor, that is a mistaken idea. If I may be so bold—

"The Court: Isn't that what you said?

"The Witness: No. I believe if you read my direct testimony you may recall—

"The Court: You say you unscrew the bottom or top, whichever it was, the defendants' structure and said it has the threads just as the plaintiff Bede has it as far as means for escape for the gases.

"The Witness: Yes. The minute passage is the same and that is old. But in my direct testimony I believe I made a summary statement, after I described the patent in suit, that the heart of the invention, the crux of the invention consisted of a combination of old elements, let's say, and the combination centered around the heat transfer block which served a multiplicity of functions. I believe I recited five.

"One function, a heat transfer block and from that we get its name. You might say that was one of the major functions of it.

"Another element is that that same heat transfer block does serve as a portion of this explosion proof chamber. Now, the explosion proof chamber per se is just the same, serves the same function generally and is constructed in the same way as explosion proof chambers have always been constructed. But we use the same element, the same block, heat transfer block as a portion of that box.

"We also use this same heat transfer block as our sensing element for sensing the temperature of our paint and operating our thermostat, and that is something that is a little new also. That same heat transfer block uses uniformity of temperature on our heating coils, so it is the multiplicity of functions that this

From the evidence, we are unable to arrive at the same conclusion as the witness that the use of the explosion-proof chamber top on the recessed end of the aluminum block heating element reduced five different functioning elements to one. Everyone knew that an aluminum block, with its high thermal conductivity, provided very uniform heating. The use of the heat of the aluminum block with its recess in one end, serving as part of the explosion-proof chamber, would seem to be the only added element. But whatever the case, the mere fact that two or more functioning elements were combined in one functioning element would not be invention. The claims of the Bede application for the patent in suit, as stated by appellants in their brief "covered the novel combination in a paint heater of the 'built-in' explosion proof chamber directly formed in the heat exchange member of the heater and utilizing such member itself to provide the chamber."

In this regard, the trial court in its findings considered this contention in the following language:

"While conceding earlier disclosure of other elements, the novel or original conception claimed for the patent in suit is exemplified by Claim 15, and particularly in the incorporation of the explosion-proof attachment or outlet into the top of the heater unit. The language of Claim 15 related thereto is as follows: 'A cap connected to said block confining said element and means within said block and forming an explosion-proof chamber within said block, which includes a minute leakage passageway communicating the chamber with the exterior of said block.'

"As practiced by the patentee, this novel feature is said to be the screw top with unsealed threads so disposed as to furnish an escape of explosive gases from the dome or upper chamber where the explosive gases or other materials may be ignited by electric sparks from the thermostatic control. This minute leakage passageway was a recognized standard requirement for a paint heater where spraying was to be done in a hazardous area.

"Stripped of the language of the patent art, the plaintiffs contend they have housed all the known essentials of a paint heater under one roof in a new, useful and successful unit for hot paint spraying.

"The prime novel feature of Bede was stated at the trial to be the original combination of the heat exchange unit block with the explosion-proof chamber, crowned by a screw top with threads so disposed

one block performs that gives us the combination of invention here.

"But the explosion proof chamber as such—this Bede invention was not just taking a standard heater and putting an explosion proof housing on it. Really, it was not that. That is what I mean. That is an erroneous concept that has been discussed a lot here recently as if that was the whole invention and that is not.

"It is the combination of functioning, combinations of functioning of this * * heat transfer body or heat transfer block which in my opinion is the heart of the invention.

"The Court: Well then, you think that it is just a reduction of the number of elements say two into one?

"The Witness: It is about five into one. Bede has taken—

"The Court: Is it a physical or mechanical union—combination, I mean?

"The Witness: Well, the heat transfer block is a physical block, of course. It is functional.

"The Court: Would it be obvious to anyone working in that art to combine them under one roof, so to speak?

"The Witness: Well, sir, it was not done until Bede did it, and the Patent Office was aware of this and the Patent Office thought it was invention.

"I am inclined to go along with the Patent Office. I do not think that you could take this one physical block, element, and make it or portions of it serve all these different functions. So the combination resided in the functioning of this one physical element.

"The Court: Well, I don't want to get into an argument with you. You go ahead."

as to comply with the safety requirements recognized by underwriters for use in hazardous areas, thus providing a minute escape passageway for the escape of gases or explosive material in such hazardous areas."

As stated by the trial court, the foregoing constituted appellants' claim to a patentable combination.

■ The combination of old parts or elements, in order to constitute a patentable invention, must perform or produce a new and different function or operation than that theretofore performed or produced by them; it is not sufficient that the combination be superior to what went before in producing a more convenient and more economical mechanism. General Motors Corp. v. Estate Stove Co., 6 Cir., 203 F.2d 912, 917.

■ A claimed patent of a combination of old elements involving no new cooperative function and producing no new result other than convenience and economy is invalid. Grinnell Washing Machine Co. v. E. E. Johnson Co., 247 U.S. 426, 38 S.Ct. 547, 62 L.Ed. 1196. In the foregoing case, the patentee had contended that the simultaneous washing and wringing with the operation of the control handle of a washing machine embraced the advance over the prior art. The court declared, however, that no new function was evolved from the combination; that the new result, insofar as one was achieved, was only that which arose from the well-known operation of each of the elements; that, while the patentee had produced a more convenient and economical mechanism than others who preceded him, such superiority did not make an aggregation patentable.

In Butex Gas Co. v. Southern Steel Co., 5 Cir., 123 F.2d 954, a patentee claimed that the main idea of his patent was to combine, in a gas dispensing system, all of the necessary valves, gauges, and other safety appliances—which, in themselves, were old—in a single accessible unit, bringing all of these elements together in a compact relationship, through the unitary fitting, rather than by the use of several such fittings, and eliminating the necessity of assembling many separate appurtenances, and the possibility of installing the various valves in the wrong order or relation to each other. The court held that this was a combination of old elements; that the novelty, if any, consisted only in a different mechanical arrangement producing no different result, and since it was a mere aggregation, it was invalid for want of invention.

■ In the instant case, there was no finding that the old elements performed any additional or different function in the combination than they performed out of it. In fact, it was admitted that the functioning of the old elements remained unchanged. In General Motors Corp. v. Estate Stove Co., 6 Cir., 201 F.2d 645, 659, it was said:

"The district court made no finding that the old elements * * * performed any additional or different function in the combination than they performed out of it. In Great Atlantic & Pacific Tea Co. v. Supermarket Equipment Corp., 340 U.S. 147, 152, 154, 71 S.Ct. 127, 130, 95 L.Ed. 162, the Supreme Court emphasized the significance of the absence of such findings, in the following language:

" 'This case is wanting in any unusual or surprising consequences from the unification of the elements here concerned, and there is nothing to indicate that the lower courts scrutinized the claims in the light of this rather severe test.

" 'Neither court below has made any finding that old elements which made up this device perform any additional or different function in the combination than they perform out of it.' * * *

"Since the elements of the combination * * * do not perform additional or different functions in the combination than they do out

**840**

of it, their combination does not partake of the quality of invention."

Since the elements of appellants' patent in suit were old elements partaking of the prior art; since they performed no additional or different function in the combination than they performed outside of it; and since the case is wanting in any unusual or surprising consequences from the unification of the elements here concerned, it follows the combination of the elements of the patent in suit resulted only in a non-patentable aggregation, and does not constitute invention.

In accordance with the foregoing, the judgment of the District Court dismissing appellants' complaint is affirmed on the ground that the patent in suit is invalid for want of invention. This disposition renders unnecessary any determination upon the issue of infringement.